# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| **DIANA KELLER,** ) | |
|     **Plaintiff,** ) | |
| ) | |
| **VS.** ) | |
| ) | **Civil Action No. SA-08-CA-0568-XR** |
| **AT&T DISABILITY INCOME PLAN,** ) | |
|     **Defendant.** ) | |
| ) | |
| ) | |
| ) | |

## ORDER

On this date, the Court considered the parties' cross-motions for summary judgment in this case. Plaintiff Diana Keller brought this suit under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits due under the terms of the AT&T Income Disability Plan ("the Plan"). Both sides have moved for summary judgment on the issue of liability. The primary question presented is whether the Plan Administrator abused its discretion in concluding that Keller did not qualify for short-term disability benefits under the Plan. The Court concludes that the Plan Administrator did not abuse its discretion and GRANTS AT&T's motion for summary judgment and DENIES Keller's motion for summary judgment.

## I. Factual and Procedural Background

Plaintiff Diana Keller began working for Southwestern Bell, L.P. in November 1993, and is employed as a customer service representative. AR:188. Her primary duties involve sitting, talking, and typing. *Id.* As a Southwestern Bell employee, Keller is a participant in the AT&T Income Disability Program, which provides qualified employees short-term and long-term disability

benefits. Keller became ill in February 2007. AR:190. Subsequently, Keller filed for short-term disability under the AT&T plan, and the claim was denied. AR:86-88. Shortly after her claim was denied, Keller sustained injuries as the result of a fall. AR:76. She appealed the denial of her claim, and it was also denied. AR:161–62. The denial of Keller's claim is the subject of the case at bar.

## A. First Claim

Keller has suffered from chronic back pain since 1987, when she was severely injured in a car accident. AR:76-78. As a result of the accident, Keller sustained multiple fractures and a spinal cord injury that necessitated the insertion of Harrington rods[1] to treat the fractures. *Id.* The rods were removed a year later, and since then, Keller has used a cane to walk. *Id.* In 2000, Keller sustained rib fractures as a result of a fall. *Id.* During Keller's treatment for her injuries, her doctors had her bone density levels tested, which revealed that she suffered from advance osteoporosis. *Id.*

In January 2007, Keller left work claiming that she suffered from increased pain, nausea, and diarrhea. Keller thought these symptoms were side effects of a new medication, Forteo, that her primary care physician, Nancy Hinitt, M.D. prescribed to treat her osteoporosis.[2] AR:190. She

---

[1]A Harrington rod is "used in spinal surgery in the treatment of compression fractures . . ." 3-H ATTORNEYS' DICTIONARY OF MEDICINE 562 (2005). Compression fractures are fractures "caused by the compression of two bones, as when vertebrae are driven into each other by a violent jolt; a fracture in which one bone is driven into another, as in jumping from a height" *Id.* at 4583. A compression fracture of a "vertebrae is usually the result of excessive flexion (bending) of the spine and occurs mostly in the chest and lumbar regions. If in addition to the bending there is a forward movement of the body (as in a car accident), a vertebra may be displaced forward on the vertebra below it, with fracture of the articular facets . . . and rupture of the interspinous ligaments . . . Such fractures are common in auto accidents when only a lap belt is worn (seatbelt fractures)." *Id.* at 4584.

[2]At some point during January 2007, Keller filed a short-term disability claim with AT&T. However, neither the briefing nor the evidence is clear on when the claim was filed. The evidence is clear that on February 13, 2007 that claim was denied because neither Keller nor her physician provided the requisite documentation to support the claim.

attempted to return to work on February 19, 2007, but claimed she was too sick to continue and went back out again on February 23, 2007. AR:29. Shortly after, Keller submitted a disability claim to the third-party claims administrator for AT&T, Sedgwick Claims Management Services, Inc. (Sedgwick).[3] AR:30. Keller claimed that because of her symptoms she was unable to continue working. *Id.* On February 26, 2007, Keller saw Dr. Hinitt, seeking treatment for her recurring symptoms, and Dr. Hinitt prescribed Boniva in lieu of Forteo to treat her osteoporosis. AR:103. By March 1, 2007, the symptoms subsided, but Keller suffered from severe leg cramping and toe clawing. AR:140. Keller did not return to work.

After consulting Mark Dirnberger, D.O., who opined that Keller could return to work, Sedgwick denied Keller's claim on March 12, 2007. AR:33–36. In a letter dated March 13, 2007, AT&T stated that it denied Keller's benefits because, in addition to several other reasons, Dr. Hinitt said "no" when asked if there were "any specific restrictions or limitations on [Keller's] activities that would keep [her] from performing [her] sedentary duty." AR:86–88.

### B. Appeal of Denial

On March 16, 2007, Keller fell in her bathtub. AR:76. She claimed that her pain levels increased in the lower lumbar portion of her back, and as a result of her increased pain, she continued to be unable to work. Pl. Motion at 4. Subsequently, Dr. Hinitt referred Keller for x-rays to determine the source of the pain, if any. AR:118–19. On March 20, 2007, Allan L. Truax, M.D., conducted x-rays on Keller's lumbar spine. *Id.* In Truax's prognosis notes, he states his overall

---

[3]For the remainder of the Court's analysis, "Plan Administrator" refers to Sedgwick. However, each of the letters denying Keller's claim was issued by AT&T based on Sedgwick's administrative decision. Accordingly, when the Court refers to the decision making process it will refer to Sedgwick, but will refer to AT&T when it discusses letters issued to Keller regarding her disability claim.

impressions of the x-rays as follows:

1.  L5-S1 spondylolysis[4] with grade 1 spondylolisthesis[5]
2.  Spondylosis
3.  Compression fractures L1, T11, T9 vertebrae[6]
4.  Surgical changes with laminextomy at the thoracolumbar junction and bone graft material present along with lateral aspect of the posterior elements.

*Id.* Based on the x-ray findings and her continued lower back pain, on March 23, 2007, Keller appealed the denial of her claim for short-term disability benefits, claiming that her injury caused her to be totally disabled as defined by the Plan. AR:124. In her claim, Keller states that she is requesting the appeal because of a "[r]ecent fall on 3/16/07," and indicates that she has additional medical documentation for Sedgwick to review. *Id.*

On April 10, 2007, at Dr. Hinitt's request, Keller underwent an MRI of her lumbar spine. AR:79–80. The prognosis notes relevant to this case state that an "[a]cute compression fraction of T11 is better defined on separate MRI with approximately 20% loss in central veterbral body

---

[4]Spondylosis is the "disintegration or dissolution of a vertebra." 5-S ATTORNEYS' DICTIONARY OF MEDICINE 5632 (2005).

[5]Spondylolisthesis is "[a] forward displacement or slipping of one of the bony segments of the spine (i.e., of a vertebra) over its fellow below, but usually the slipping of the fifth or last lumbar (loin) vertebra over the body of the sacrum .... To visualize this, one may conceive the spine as a stack of coins or, better still, of tuna cans. The slipping of a coin or a can forward upon the one below represents a case of spondylolisthesis." 5-S ATTORNEYS' DICTIONARY OF MEDICINE 5627 (2005).

[6]A note next to this comment reads: "Old L1 fracture, T9 fracture is old [and] T11 fracture is old & new fractures." The portion of the note that categorizes Keller's T11 fracture as "old" contradicts the findings in Keller's medical records, including the comments of her treating physicians and the comments of both of the consulting physicians that evaluated her case for Sedgwick. Therefore, the Court views these statements as an anomaly with no bearing on the outcome of the Court's decision as both parties seemed to disregard it in their analysis.

height." *Id.*[7]  A handwritten note next to this portion of the MRI report reads: "Acute compression

fracture T11" and "Send to pain management for injection therapy."  *Id.*  As a result of the x-ray and

MRI findings, Dr. Hinitt referred Keller to Gilbert Meadows, M.D., an orthopedic surgeon with the

South Texas Spinal Clinic.  AR:76-78.

Dr. Meadows saw Keller on April 2, 2007, and after conducting a physical exam, he

reviewed Keller's lumbar spine MRI.[8]  AR:168–70.  In his prognosis notes, Dr. Meadows

summarized Keller's condition as follows:

> All of her spasticity[9] is residual from her old traumatic event in 1987.
> Her chronic back pain emanates from spondylolytic spondylolisthesis
> at L5-S1 with disc degeneration and herniation at L4-5.  Her more
> acute pain is related to a compression fracture of T11 of the
> biconcave type.  *Over the past three weeks that pain is much better
> on a gradual basis.*  Her chronic irritating back pain with prolonged
> sitting is related to the structural abnormalities at the lumbosacral

---

[7]The lumbar MRI report submitted into evidence by both Keller and AT&T is incomplete.
The third page is missing, which likely contained the impressions of the person who conducted the
MRI.  In a footnote in Keller's motion for summary judgment, it explains that "the file appears to
be incomplete as the report indicates there is a page 3, but there is no page 3 within the
[administrative] record as provided and marked by ATT.  Since Dr. Meadows read the films
separately; however, the absence of the complete report is consequential."  Pl. Motion at 5.

[8]The MRI that is included in the administrative record is labeled "MRI OF THE LUMBAR
SPINE."  In her brief, Keller makes reference to a "thoracic and lumbar MRI."  After receiving
supplemental submissions of evidence from Keller's counsel, it seems that the thoracic MRI is a
separate document.  Because the document was not included in the administrative record, it had no
effect on the Court's decision.  *See Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 394 (5th
Cir.2006) (explaining that when reviewing the plan administrators factual findings, a district court
is constrained to the evidence that was before the plan administrator when she made her decision).

[9]Spasticity is a disorder "of muscle movements originating in the central nervous system.
They are marked by increased muscle tone ..., spasm, and loss of skill in muscle use. The most
common causes are multiple sclerosis, cerebral palsy, injuries of spinal cord, and stroke."  5-S
ATTORNEYS' DICTIONARY OF MEDICINE 4663 (2005).

junction. *We discussed vertebroplasty[10] for the T11 compression fracture but as she is improving I advised her to wait until I recheck her in four weeks.* If the trend for ongoing improvement is there then no vertebroplasty would be required. Stabilization of the spondylolisthesis and disc herniation from L4 to S1 can be considered at some point. *I advised her to get involved with some walking in the pool which should allow her to safely do aerobic activity and also improve her balance without falls.* I would not recommend any additional injection therapy for her dynamic clawing in her right foot. I also suggested that she have her GYN physician do hormone assays to ensure adequate amounts of estrogen as it relates to her osteoporosis.

*Id* (emphasis added).

On April 26, 2007, Pragma Patel, M.D., a board certified internal medicine doctor who works as a consultant for Sedgwick, submitted a report to Sedgwick reviewing Keller's medical records. AR:83. Dr. Patel noted:

> . . . [Keller] does have compression fractures, for which she is on pain medications. She is also receiving physical therapy. There is no objective information to support an inability to perform her sedentary job duties.

AR:84. He further explains:

> The employee is not disabled for the above dates. She is receiving physical therapy and is on pain medication. There is no objective information to support an inability to perform her sedentary job duties.

*Id.* Sedgwick took no action based on Dr. Patel's review because, shortly after, Keller requested that Sedgwick delay its review of her appeal. On May 3, 2007, Sedgwick granted Keller's request for a 21-day delay of its review so that Keller could submit additional information that could be

---

[10]Vertebroplasty is "[a] procedure used to relieve the pain of vertebral compression fractures. Under x-ray guidance, a needle is inserted into the affected vertebra and a bone cement injected into the vertebra. Hardening of the cement stabilizes the fractured vertebra." 6-V ATTORNEYS' DICTIONARY OF MEDICINE 2742 (2005).

significant to her appeal. AR:132.

On May 7, 2007, Keller saw Dr. Meadows for a follow-up visit. AR:131. Because the pain in her back had not diminished, Dr. Meadows prescribed vertebroplasty to repair the compression fracture at T11. *Id.* The vertebroplasty was performed by Dr. Dix on May 9, 2007. AR:146.

On May 23, 2007, Richard A. Silver, M.D., an orthopedic surgeon who works as a consultant for Sedgwick, submitted a report to Sedgwick, evaluating Keller's medical records. The records included: (1) AT&T's case notes from February 23, 2007 to May 15, 2007, (2) Dr. Meadows prognosis notes from February 6, 2007 to May 7, 2007, (3) miscellaneous notes from May 1, 2007, (4) Dr. Patel's April 26, 2007 case review, (5) X-rays from February 12, 2007 to March 20, 2007, (6) the lower lumbar MRI from April 10, 2007, (7) a miscellaneous test from August 2006, and (8) another miscellaneous document from March 23, 2007. AR:136. Based on a review of these records, he concluded that Keller was not disabled from her regular job as of February 23, 2007. AR:139. He noted in the "Rationale" portion of his report that:

> The claimant fell and had a new acute compression fracture at T11 in March 2007, *her bracing has been adequate, and compression fracture has not become progressively worse.* The claimant has full normal range of motion of the lumbosacral spine as delineated on 4/12/07 by the orthopedic surgery consultant, Dr. Meadows. There was no focal neurological deficit in the right or left lower extremity and there was previously noted antalgic gait because of the right lower extremity spasticity and claw toeing with ambulation on a cane . . .

AR:139 (emphasis added)

The same day, Dr. Patel submitted a second report to Sedgwick evaluating Keller's medical records. He stated that he would "defer to the orthopedic [Silver] as it relates to Ms. Keller's surgery and [degenerative disc disorder] of the lumbar spine." AR:140. Also on the same day,

Sedgwick issued a letter to Keller explaining that it needed additional time to review her claim; so, pursuant to federal law it was extending the review of her appeal by 45 days. AR:142.

On May 24, 2007, Keller returned to Dr. Meadows's office for a follow-up visit, complaining that the procedure offered no relief and she felt worse. AR:148. Her pain was in the thoracic region and her chest wall. *Id.* As the procedure at T11 did not decrease her acute pain levels, Dr. Meadows prescribed vertebroplasty for repair of her spinal fractures at T9 and L1. *Id.* However, Keller opted not to undergo the procedures. Pl. Motion at 5.

On June 6, 2007, Dr. Silver issued a second report to Sedgwick after reviewing notes confirming Keller's vertebroplasty procedure and notes from Dr. Meadows pertaining to Keller's post surgery follow-up visit on May 24, 2007. AR:153–55. He concluded that the additional medical information did not change his opinion that Plaintiff was not disabled. AR:155. In the "Rationale" section of his report, Silver notes:

> There is no evidence of any focal neurological deficit at the right or left lower extremity. She is on baclofen for the spasticity. She ambulates with a cane. The original reports stand. There is nothing new in the additional medical records or in the previous medical records or in the A4 report as authored by myself that would change my opinion. On the medical evidence based review of the medical records available, *the claimant's subjective complaints are not substantiated by objective clinical findings that would prevent her from being employed or being fit for full duty in her normal occupation.* Job description has been reviewed.

*Id.* (emphasis added). Dr. Patel issued his third review of Keller's record on the same day also after reviewing notes confirming Keller's vertebroplasty procedure and notes from Dr. Meadows pertaining to Keller's post-surgery follow-up visit. AR:157–58. He also concluded that nothing in the record changed his opinion that Keller was not disabled. AR:158. He explains:

8

. . . Your [Keller's] file was referred to Richard A. Silver, M.D., a board certified orthopedic surgeon, for an independent review. He noted your surgical history and noted you had solid fusion at T11-T12 and T12-L1 area. Dr. Silver also noted your claw toe deformity and spasticity. He noted there is no evidence of any focal neurological deficit of the lower extremities. There is loss of functionality of the right lower extremity, which is chronic. Additionally, there is no documentation of loss of functionality of the lumbosacral spine. The clinical information provided does not provide evidence of an impairment that would prevent you from performing your job duties from February 23, 2007 until your return to work date.

AR 158. On July 2, 2007, Sedgwick denied Keller's claim. In the denial letter, based on Dr. Silver's and Dr. Patel's reviews of Keller's medical records, Sedgwick stated its rationale for denying Keller's benefits:

Although some findings are referenced, *none are documented to be so severe as to prevent you from performing the duties of your job* as Service Representative, with or without reasonable accommodation from February 23, 2007 until your return to work date.

AR. 166-67 (emphasis added).

### C. Post-Denial of Benefits Appeal

On July 9, 2007, Dr. Hinitt submitted a note to Sedgwick on Keller's behalf. AR:171-72.

The note states in its entirety:

Ms. Keller has been a patient in my clinic since 1988. She has right leg hemeparis due to a spinal cord injury. Most recently she has had problems related to osteoporosis and compression fractures in her back. She missed an extensive amount of work the early part of this year. She has since had vertebroplasty and physical rehab. I feel she can work 1/2 time schedule if that 20 hours can be spread over 4 or 5 days. Long periods of sitting increase her back pain. I feel certain that she can manage part-time hours without absenteeism.

*Id.* Following the receipt of Dr. Hinitt's note, Sedgwick wrote a letter to Keller dated July 23, 2007,

explaining that the decision made by Sedgwick effective July 2, 2007 was final and not subject to further consideration. AR:175.

Almost a year later, on May 7, 2008, Keller received a letter she claims awarded her disability benefits from the Social Security Administration. AR: 166-68. Keller sent the letter to Sedgwick and requested that her claim be reconsidered in light of the Social Security Administration's determination. *Id.* On June 24, 2008, Sedgwick sent Keller a letter explaining that its decision was final and her claim would not be reconsidered. AR:70.

Following the receipt of Sedgwick's final denial letter, Keller initiated a lawsuit against AT&T on July 16, 2008. Almost a year later, on July 17, 2009 both AT&T and Keller filed cross-motions for summary judgment.

### D. The Parties' Arguments[11]

Keller's motion for summary judgment centers on the pain caused by the compression fracture at her T11 vertebrae. To this end, she claims that Sedgwick abused its discretion in two ways. First, Keller argues that Dr. Silver's report misrepresents Keller's medical records because it ignored that Keller's T11 fracture caused her "debilitating pain." She also complains that Dr. Silver's report only focuses on the lack of neurological deficits in Keller's medical reports as evidence that she is not disabled. Second, Keller claims that Sedgwick abused its discretion because in its final letter denying her benefits the rationale ignored Keller's "debilitating pain" from her T11 fracture. Keller also claims that Sedgwick abused its discretion because it did not consider Dr. Hinitt's July 9, 2007 handwritten letter nor Keller's letter from the Social Security Administration.

---

[11]Both parties filed responses to each other's motions for summary judgment. Below, the Court integrates the parties' responses with the arguments made in their respective motions for summary judgment.

Finally, Keller argues that Sedgwick's reliance upon unreasonable opinions from experts suggests bad faith to such an extent that she is entitled to attorney's fees.

In AT&T's motion for summary judgment, it argues that Sedgwick's denial of Keller's claim was not an abuse of discretion as the decision was based on the evidence in Keller's medical records and the reports of Drs. Silver and Patel. Specifically, AT&T argues that there was no objective evidence in Keller's medical records to prove that she could not perform her work duties, which include sitting, typing, and talking on the phone. AT&T also argues that Sedgwick did not abuse its discretion by refusing to consider Dr. Hinitt's note because the information in the note is conclusory, nor did Sedgwick abuse its discretion by refusing to consider the letter from the Social Security Administration because the information in the letter is incomplete.

After an overview of the relevant parts of the Plan and its short-term disability eligibility requirements, as they relate to this dispute, the Court addresses the arguments presented by both parties.

**E.      The Plan**

Under the AT&T Income Disability Program, short-term disability benefits are:

> . . . designed to provide some income replacement if an Eligible Employee cannot work, with or without reasonable accommodations, because of an approved Total Disability and/or Partial Disability that results from either Illness or Injury . . .

AR:234. Relevant to this case, the Plan states that "Total Disability":

> . . . for short-term disability means that because of Illness or Injury, you are unable to perform *all of the essential functions of your job* or another available job assigned by your Participating Company within the same full-time or part-time classification for which you are qualified.

AR:236 (emphasis added). If a party is denied benefits, then the party may appeal the determination by submitting an appeal within 180 days after receiving denial of the benefits. AR:87. Also relevant to this case, if a claimant would like to include medical evidence in the appeal, the claimant or their health care provider must provide: (1) a clear outline of their level of functionality, (2) a description of how their level of functionality impacts their ability to work and perform their daily activities, (3) a detailed description of the treatment provider's rationale for their level of functionality, and (4) clinical documentation that supports the treatment provider's rationale. AR: 90. The appeals procedure portion of the Plan explains:

> A qualified individual who was not involved in the decision to deny your initial claim will be appointed to decide the appeal. If the appeal is related to clinical matters, the review will be done in consultation with a health care professional with appropriate expertise in the field and who was not involved in the initial determination.

AR: 92.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Standard summary judgment rules control in ERISA cases. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004). Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment. A summary judgment movant must show by affidavit or other evidence that there is no genuine issue regarding any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving

party has carried its summary-judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

To conclude that there is no genuine issue of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses" and disregarding the evidence favorable to the nonmovant that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000); *see* FED. R. CIV. P. 56(c). However, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994).

## B.     Denial of Benefits

Typically, the review of a plan administrator's decisions is two-fold. *High v. E-Sys.  Inc.,* 459 F.3d 573, 577 (5th Cir. 2006). First, the Court determines whether the plan administrator's determination was legally correct. *Id.* In ascertaining the legally correct interpretation of the policy, a court must consider (1) whether a uniform construction of the policy has been given by the administrator, (2) whether the interpretation is fair and reasonable, and (3) whether unanticipated costs will result from a different interpretation of the policy. *Gosselink v. Am. Tel. & Tel. Inc.,* 272

F.3d 722, 726 (5th Cir.2001) (citing *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 637-638 (5th Cir.1992)).

If the determination was legally correct, there is no abuse of discretion. *Id.* If the determination was incorrect, then the Court proceeds to step two and determines whether the interpretation was an abuse of discretion. *Id.* However, the Court can skip the first step if it can more readily determine that the decision was not an abuse of discretion. *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009). Neither Keller nor AT&T has conformed their arguments to the traditional two-step analysis. Instead, both parties focus their arguments on whether Sedgwick abused its discretion when it denied Keller short-term disability benefits. Thus, the Court skips step one of the analysis and reviews only whether the Plan Administrator abused is discretion in denying Keller's claim.

An administrator's factual determinations are always reviewed for an abuse of discretion. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir.1999).[12] An abuse of discretion exists if the administrator's factual determinations are arbitrary and are not supported by substantial evidence. *See Meditrust Fin. Servs. Corp. v. Sterling Chem.*, 168 F.3d 211, 215 (5th Cir. 1999) ("A

---

[12] A "sliding scale" is applied to the abuse of discretion standard where it is determined that the administrator has acted under a conflict of interest. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 296 (5th Cir.1999). "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* at 297. When a minimal basis for a conflict is established, we review the decision with "only a *modicum less* deference than we otherwise would." *Id.* at 301 (emphasis added). Here, Keller does not directly assert that a conflict of interest exists between AT&T and Sedgwick. She merely describes Sedgwick as "a branch within [AT&T's] organization that is devoted to reviewing and deciding disability claims made under the AT&T Plan." However, nowhere in her complaint does she claim that a conflict of interest exists or that the Court should apply a modified standard of review. As Keller has provided no evidence to prove that a conflict of interest exists between AT&T and Sedgwick, the Court does not apply a "sliding scale" analysis.

decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828-29 (5th Cir.1996))). For the factual findings to be supported by substantial evidence, there need only be a rational connection between the known facts and the decision or between the found facts and the evidence. "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness–even if on the low end." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007).

When assessing factual questions, the district court is constrained to the evidence before the plan administrator. *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 394 (5th Cir. 2006) (quoting *Vega*, 188 F.3d at 299). "The administrative record consists of the relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300. The Court may not review evidence outside the administrative record to resolve an issue of fact. *See id.*

"The law requires only that substantial evidence support a Plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* If the Plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail. *Id.*

## III. Analysis

**A.**     **Whether Sedgwick abused its discretion in making the factual determination that Keller does not have an occupational disability that would prevent her from conducting her job duties.**

Sedgwick did not abuse its discretion when it denied Keller's claims. Keller primarily argues that Sedgwick abused its discretion by relying on Dr. Silver's[13] reports because Dr. Silver's reports (1) focus solely on Keller's lack of neurological deficits from her T11 compression fracture, and (2) disregard Keller's debilitating pain due to her T11 compression fracture. Keller also argues that Sedgwick abused its discretion by generally disregarding Keller's pain when it denied her claim. The Court disagrees; these arguments do not meet Keller's burden of proving that Sedgwick's decision was arbitrary, unreasonable, or without evidentiary support.

Sedgwick did not abuse its discretion by relying on Dr. Silver's reports. To begin, both of Dr. Silver's reports indicate that his conclusions were based on several factors. In the first report, he concluded that Keller was not disabled as defined in the Plan because, among many things, her T11 fracture did not continue to progress, the range of motion of her lumbosacral spine was not limited, and her pain was improving with medication, a back brace, and physical therapy. AR:138. In the second report, Dr. Silver concluded that his original decision was correct because, in addition to a lack of neurological deficits, the most recent medical records provided by Dr. Meadows and Keller's other treating physicians provided no objective evidence that she could not perform her job duties. AR: 155.

_____

[13] Several times in Keller's filings to this Court, she seems to argue that Sedgwick erroneously relied on Dr. Patel's reports. However, these arguments are difficult to discern. Therefore, the Court does not address this argument, but instead focuses on the argument that is fully briefed in Keller's motion for summary judgment that Sedgwick erroneously relied on Dr. Silver's reports.

Furthermore, Dr. Silver's report did not disregard Keller's pain. In fact, both of Dr. Silver's reports, dated May 23, 2007 and June 6, 2007, discuss the T11 fracture and treatment for the pain associated with the fracture multiple times. AR:136-39. Notably, Dr. Silver's first report states:

> In March 2007, [Keller] fell in a bathtub and sustained a new acute compression fracture at T11 of approximately 20%. There was no progression of that compression fracture. There was no loss of range of motion of the lumbosacral spine. There were no focal neurological deficits in the lower extremity and *she was wearing the brace appropriately for the discomfort at T11 and was improving with medication and bracing and conservative care*.

AR:138 (emphasis added).

Even if Dr. Silver's conclusions were based on Keller's lack of neurological deficits, this would not be enough to invalidate Sedgwick's decision to rely on this information and deny Keller's claims. Administrators may rely on the opinions of other medical doctors instead of relying on the patient's treating physician if the administrator does not arbitrarily disregard reliable evidence. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (explaining that "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician"). Here, Dr. Silver reviewed Keller's records for "reliable evidence" that Keller was disabled and unable to perform all of her regular job duties–sitting, talking, and typing. As he notes in his report, he found no such evidence.

To the contrary, the evidence indicates that none of Keller's treating physicians claimed that the pain from her T11 fracture prevented her from performing her job duties. Shortly after Keller's March 2007 fall, she received an MRI, and the doctor who gave her the MRI sent her to pain management for injection therapy. AR:79-80. Then, Keller was sent to Dr. Meadows by her primary-care physician, Dr. Hinitt, because her MRI showed a new compression fracture at the T11

vertebrae.  AR:168-70.  At her initial appointment with Dr. Meadows, he stated in his progression

notes that Keller's pain was improving and told Keller that she may not need vertebroplasty, the

procedure used to seal the fracture.  *Id.*  Keller acknowledges in her brief that the primary effect of

a compression fracture is increased imbalance and the possibilities of falling and not an inability to

sit, talk, or type.  Pl. Motion at 17.  During Keller's initial visit with Dr. Meadows, according to his

notes, he addressed the problem by advising her to do physical activity to improve her balance to

prevent falling.  AR:170.  At Keller's follow-up visit with Dr. Meadows, she complained that her

pain persisted, and Dr. Meadows recommended surgery.  AR:131.  He also noted that sitting eased

Keller's pain.  *Id.*  After the procedure, Keller still did not feel better, but Dr. Meadows noted that

the vertebroplasty repaired Keller's T11 fracture.  AR:148.  Based on these facts, it is difficult for

the Court to conclude that Sedgwick abused its discretion.  The difficulty lies in the fact that Keller's

disability claim was based on pain caused by the T11 fracture, but none of Keller's treating

physicians claim that the pain from her fracture caused her to be disabled and unable to perform her

job duties.  Thus, Sedgwick's conclusion seems rationally related to the evidence.

Furthermore, Sedgwick did not abuse its discretion when it did not take Keller's pain into

account because there was no objective evidence in Keller's medical records proving that the pain

would prevent her from performing her job duties.  *See Vercher v. Alexander & Alexander, Inc.,* 379

F.3d 222, 230-31 (5th Cir. 2004) (explaining that an administrator's insistence that a claimant

provide objective evidence of their disabling condition is not an abuse of discretion).  Keller, relying

on the Fifth Circuit's decision in *Lain v. Unum Life Insurance Co. Of America*, 279 F.3d 337, 347

(5th Cir. 2002), claims that Sedgwick abused its discretion because it did not take into account her

pain.  However, *Lain* does not stand for this contention.  In *Lain*, the Court explains that it decision

18

is not based on the pain suffered by the claimant. *Id.* In reaching its decision, the Fifth Circuit pointed to substantial evidence that the claimant could not perform her duties. The claimant's treating physician submitted a report to the plan administrator evaluating her condition and explained that the claimant could not perform her work duties. In addition, the plan administrator's physicians, as well as several tests, could not refute or confirm the treating physician's diagnosis. The Fifth Circuit also noted several practices on the plan administrator's part that indicated bad faith supported an abuse of discretion finding, *i.e.* the plan administrator ignoring the fact that the tests were conducted when claimant was not suffering from one of the sporadic pain episodes that were the basis for her disability claim. Here, neither of Keller's treating physicians nor Sedgwick's experts notes claim that Keller cannot perform one or all of her job duties, and as mentioned above, the evidence does not support Keller's claim either. Furthermore, there is no evidence that Sedgwick acted in bad faith. Conversely, Sedgwick extended deadlines for Keller so that she could submit additional evidence, and Sedgwick's advising physicians completed a total of five evaluations of Keller's medical records.

**B.** **Whether, after Keller received Sedgwick's letter denying her benefits, Sedgwick abused its discretion by failing to consider a note from Dr. Hinitt stating that Keller could not work full time and a letter from the Social Security Administration dated May 7, 2008.**

Keller argues that Sedgwick abused its discretion by failing to consider a July 9, 2007 note from Dr. Hinitt that briefly described Keller's medical conditions and explains that Keller "can work 1/2 time schedule if that 20 hours can be spread over 4 or 5 days . . ." and that "[l]ong periods of sitting increase her back pain." AR:171-72. Keller also argues that Sedgwick abused its discretion because it would not consider a letter from the Social Security Administration dated May 7, 2008 that seems to grant her Social Security benefits. AR:66-68. However, the Court disagrees.

In *Vega v. National Life Ins. Serv., Inc.*, the Fifth Circuit stated:

> Before filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that *gives the administrator a fair opportunity to consider it* . . . If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record . . . Thus, we have not in the past, nor do we now, set a particularly high bar to a party's seeking to introduce evidence into the administrative record.

> We hold today that the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that *gives the administrator a fair opportunity to consider it.*

188 F.3d 287, 300 (5th Cir. 1999) (emphasis added). The Fifth Circuit acknowledged in *Keele v. JP Morgan Chase Long Term Disability Plan*, that it is difficult to discern the time frame in which a claimant can submit new evidence to a plan administrator so that the administrator has a fair opportunity to consider it. 2007 WL 557359 *4 (5th Cir. Feb. 14, 2007). However, the Fifth Circuit in *Keele* decided that it "need not decide this question of Vega's precise requirements today, because we conclude that the documents in dispute do not change the disposition of the case." *Id.*

Here, neither Dr. Hinitt's note nor the Social Security Administration's letter would change the disposition of Keller's case. Although Dr. Hinitt's note is the only document in which one of Keller's treating physicians claims that she cannot perform her job duties, it is conclusory. The letter never states what injuries specifically make it difficult for Keller to perform her job duties. Instead, the note lists Keller's ailments and summarily concludes that sitting causes her back pain. These types of conclusory statements are not enough evidence to help Keller meet her heavy burden under the ERISA standard of review. The same can be said of the letter from the Social Security Administration. The letter, which is two paragraphs long, does not indicate specifically that Keller

is entitled to benefits, nor does the letter state that Keller is unable to perform her essential job duties. As explained above, Keller has the burden of proof. The letters Keller provided after Sedgwick made its final decision do not aid her in this endeavor. Thus, even considering the additional evidence, the Court concludes that Sedgwick did not abuse its discretion.

**C.     Whether AT&T is entitled to summary judgment?**

Based on the foregoing analysis, the Court finds that no fact issues remain on the liability issue, and that AT&T is entitled to summary judgment.

## IV.  CONCLUSION

After careful consideration of the parties' submissions, the evidence, and the applicable law, the Court GRANTS AT&T's motion for summary judgment (docket no. 25) and DENIES Keller's motion for summary judgment (docket no. 26). Plaintiff shall take nothing by her claims against Defendant, and Defendant is awarded costs. Defendant must file a bill of costs in the form required by the Clerk of this Court within fourteen days of entry of the Judgment. Because this Order disposes of all remaining claims, all remaining settings in this case, including trial, are VACATED. The Clerk is directed to close this case and to issue a judgment in accordance with Rule 58.

It is so ORDERED.

SIGNED this 1st day of October, 2009.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE